**AFFIDAVIT**

I, Than Trung Nguyen, having been first duly sworn, do hereby depose and state:

***INTRODUCTION AND AGENT BACKGROUND***

1.      I have been a Special Agent with Internal Revenue Service – Criminal Investigation ("IRS-CI") since October 2018.  My responsibilities include the investigation of tax fraud, money laundering, and the illegal structuring of financial transactions, among other federal criminal violations.  I hold a bachelor's degree in economics from Boston College and masters degrees in accounting and business administration from the University of Massachusetts, Boston.  I have received extensive training in financial investigative techniques, money laundering, Bank Secrecy Act violations and in the law of search and seizure under the Fourth Amendment.

2.      I am investigating ███████ ("██████ and Richardson Rhau ("Rhau") for their involvement in wire fraud, bank fraud, bank and wire fraud conspiracy, false statements to a financial institution, theft of government funds, concealment money laundering, unlawful financial transactions, and money laundering conspiracy in violation of 18 U.S.C. §§ 1343, 1344, 1349, 1014, 641, 1956(a)(1)(B)(i), 1956(h), and 1957 ("the Target Offenses").

3.      I submit this affidavit in support of a criminal complaint charging ██████ and Rhau with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and conspiracy to commit unlawful monetary transactions, in violation of 18 U.S.C. § 1956(h), as well as for a warrant to arrest each of them, because the investigation reveals that ██████ and Rhau conspired to submit one or more fraudulent loan applications and transfer proceeds thereof.

4.      I also submit this affidavit in support of a warrant to search 359 Pleasant Street in Brockton, Massachusetts (the "Subject Premises") for evidence, fruits, and instrumentalities of the

Target Offenses, including, among other evidence, Rhau's mobile phone with the assigned number (617) 955-2100 (the "Subject Device").

5.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit does not set forth all facts developed during the course of this investigation and does not set forth all of my knowledge about this matter.  It is intended to show that there is probable cause to believe that ███████ and Rhau have committed the Target Offenses and that there is probable cause for the requested search warrant.

## PROBABLE CAUSE

### Relevant Individuals and Entities

At all times relevant to this affidavit:

6.      ███████████ lived in Brockton, Massachusetts.   Financial records and records maintained by the Massachusetts Secretary of the Commonwealth and the Internal Revenue Service ("IRS") list his residence as a home on Elliot Street in Brockton (the "Elliot Street Address").

7.      The Bigger Picture Logistics LLC ("Bigger Picture") purported to be a business servicing "warehouse and all cargo delivery needs," according to its Certificate of Organization filed with the Massachusetts Secretary of the Commonwealth on or about April 7, 2020.  Records from the Secretary of the Commonwealth list ██████ and two other residents of Brockton as Bigger Picture's managers and signatories.  Those records list Bigger Picture's address as a property on Dover Street in Brockton (the "Dover Street Address").

8.      Rhau also lived in Brockton, Massachusetts.

2

9.      Dege Services purported to be a freight hauling business located at 359 Pleasant Street in Brockton, Massachusetts (the "Subject Premises").  Dege Services was registered as a carrier with the U.S. Department of Transportation ("USDOT") and purportedly operated by Rhau's spouse.

10.     Recruiter 1, Recruiter 2, and Recruiter 3 were residents of Florida.

11.     The U.S. Small Business Administration ("SBA") was an agency of the United States government authorized to enable and provide for loans, guaranteed by the government, both directly and through banks, credit unions, and other lenders.

12.     Kabbage Inc. ("Kabbage") was based in California.  It was an approved lender of Paycheck Protection Program ("PPP") loans, which are described below.

13.     Fountainhead SBF LLC ("Fountainhead") was based in Florida.  It was also an approved PPP lender.

14.     Itria Ventures LLC ("Itria") was based in New York.  It was also an approved PPP lender.

15.     Bank of America, N.A. ("Bank of America") was a federally insured financial institution with headquarters in North Carolina.  It was also an approved PPP lender.

**Overview of the CARES Act and the PPP**

16.     The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to Americans suffering the economic effects of the COVID-19 pandemic.

17.     The CARES Act authorized forgivable loans to small businesses and non-profits for job retention and certain other expenses through the PPP.

3

18.     In order to obtain a PPP loan, a qualifying business had to submit a PPP loan application signed by an authorized representative of the business.  The PPP loan application required the business, through its authorized representative, to acknowledge the program rules and make certain affirmative certifications.  In the PPP loan application, the small business, through its authorized representative, had to state, among other things, its (i) number of employees and (ii) average monthly payroll expenses.  These figures were used to calculate the amount of a PPP loan the business was eligible to receive; typically, a business was eligible to receive two-and-a-half times its average monthly payroll expenses.  In addition, businesses applying for a PPP loan had to provide documentation of their payroll expenses.

19.     A PPP loan application had to be processed by an authorized SBA lender.  If a PPP loan application was approved, the participating lender funded the PPP loan using its own monies, which were 100 percent guaranteed by the SBA.  Data from the application was regularly transmitted by the lender to the SBA in the course of processing the loan.

20.     PPP loan proceeds had to be used by the business on certain permissible expenses, including payroll costs, interest on mortgages, rent, and utilities.  The PPP allowed the interest and principal on the PPP loan to be entirely forgiven if the business spent the loan proceeds on these permissible expenses within a designated period of time and used a certain percentage of the PPP loan proceeds on payroll expenses.

**Overview of the Scheme**

21.     In June 2020, Rhau connected each of ███████ and another Massachusetts-based borrower ("Borrower 1") to Recruiter 1 by telephone.  As a result of their communications with Recruiter 1, ███████ and Borrower 1 caused the submission of fraudulent PPP applications that falsely reported inflated numbers of employees and total monthly payroll expenses for ███████

and Borrower 1's respective businesses.  As a result of these applications, Kabbage disbursed $313,852 to Bigger Picture and $836,800 to Borrower 1's business in June 2020.

22.     Additionally, Rhau caused the submission of at least five PPP applications and at least three Economic Injury Disaster Loan ("EIDL")[1] applications for himself and for Dege Services between April 2020 and April 2021.  As a result of several fraudulent applications, Rhau obtained $104,166 in PPP funds and $94,800 in EIDL funds.

**The Fraudulent Bigger Picture Application**

23.     According to business records, Kabbage received a PPP application for Bigger Picture on or about June 9, 2020.  This application identified ████████ as the primary contact for Bigger Picture, listed the Elliot Street Address as ████████ personal address, and listed the Dover Street Address as Bigger Picture's business address.

24.     The application represented that Bigger Picture had 25 employees and average monthly payroll expenses of $125,541.  Based on these amounts, the application sought a PPP loan of $313,852.

25.     The supporting documentation for the application submitted to Kabbage included a photocopy of ████████ Massachusetts driver's license, showing Elliot Street Address, and Bigger Picture's Articles of Incorporation, showing the Dover Street Address.

---

[1] The CARES Act also authorized the SBA to issue EIDL funds directly to small businesses.  Applicants applied for EIDL funds through the SBA's online portal and provided information about the affected entity's employees, gross revenues, and costs of goods sold in the 12 months prior to January 31, 2020.

26.     The supporting documentation also included a purported copy of a 2019 Form W-3 (Transmittal of Wage and Tax Statements)[2] for Bigger Picture.  The Form W-3 indicated that Bigger Picture's gross payroll expenses in 2019 were $1,440,000 and that the company withheld $405,189 in federal income taxes.  The Form W-3 also reported that Bigger Picture paid $89,280 in Social Security wages and withheld that same amount in Social Security taxes, and that Bigger Picture paid $20,880 in Medicare wages and withheld that same amount in Medicare taxes.

27.     According to business records, Kabbage approved the application and disbursed a PPP loan of $313,852 to Bigger Picture on or about June 17, 2020.

28.     Kabbage's records indicate that, on or about November 2, 2020, ███████ spoke with a Kabbage employee and requested that Kabbage update the email address it had on file.  Kabbage's records reflect that ███████ inquired about PPP loan forgiveness, but that loan forgiveness applications were not accepted at that time.

29.     Business records indicate that Kabbage received additional documents in support of a second draw PPP loan application on or about February 23, 2021.  The supporting documentation included the first page of a purported 2019 Form 1120 (U.S. Corporation Income Tax Return).  This Form 1120 indicated that Bigger Picture had a gross income of $2,300,000 and wage expenses of $1,440,000 in 2019.  Additionally, the supporting documentation included a purported copy of a 2020 Form 940 (Employer's Annual Federal Unemployment (FUTA) Tax Return) and purported copies of Form 941 (Employer's Quarterly Federal Tax Return) for the fourth quarter of 2019 and the first quarter of 2020.  The Form 940 indicated that Bigger Picture

---

[2] Form W-3 is used to summarize and transmit to the Social Security Administration all Form W-2s (Wage and Tax Statement) issued by a business for a calendar year.  The amounts reported on a business's Form W-3 typically represent all wages the business paid during the year.

had paid total wages in 2020 of $1,440,000.  The two Forms 941 indicated that Bigger Pictures paid $360,000 in wages for each of the two quarters.

30.     Based on my review of this loan application, bank records, and the investigation to date, I have determined that ███████ and Rhau caused the submission of the June 2020 PPP application to Kabbage through others, including Recruiter 1 and Recruiter 2, in order to obtain a PPP loan to which Bigger Picture was not entitled (and in an amount for which Bigger Picture was never eligible):

a.     I have reviewed bank records, business records, internet service records, telephone records, and email communications.  Based on my review of these records, I have concluded that Recruiter 2 submitted fraudulent PPP applications for ███████ and other individuals; that Recruiter 1 and Recruiter 3 identified potential borrowers, including ███████ to receive fraudulent PPP loans from applications submitted by Recruiter 2; and that Recruiter 1, Recruiter 2, and Recruiter 3 received kickback payments of "commissions" from the borrowers who received PPP funds as a result.

b.     Bank records demonstrate that shortly after receiving PPP funds from Kabbage, between on or about June 19, 2020 and July 3, 2020, Bigger Picture sent four checks totaling $62,760 to Recruiter 1's purported not-for-profit organization in Florida (each for $15,690).  ███████ signed all four checks, and the memo line on each check read "services."  Shortly after receiving the first three of these checks, Recruiter 1 purchased a cashier's check for $30,000 payable to Recruiter 2's company.  Bigger Picture also sent five checks totaling $45,000 (each for $9,000) to Rhau between June 19, 2020 and July 31, 2020.[3]

---

[3] Each of these checks bore the memo line "Equipment Rental."  Based on my knowledge of the investigation and review of financial records relating to Rhau, I am not aware of any equipment rental business that Rhau operated.

c.      Business records indicate that the Internet Protocol ("IP") address 134.56.24.34 was used to submit the June 2020 Bigger Picture PPP application to Kabbage.  Business records from Kabbage and another loan servicer for several SBA-authorized PPP lenders revealed at least 120 additional PPP applications that were submitted from this IP address and/or from the same device (based on common device identification number) between April 2020 and July 2020.  These PPP applications were submitted on behalf of business entities and/or self-employed individuals in Florida, Georgia, Maryland, Massachusetts, and New York.

d.      Internet service provider records indicate that this IP address was subscribed to an address in Florida neighboring the address of Recruiter 2 during the relevant time period.[4]  Bank records reflect that Recruiter 2 logged into his personal and business bank accounts from this IP address.  Because each of the applications noted above originated from this same IP address, I have concluded that Recruiter 2 submitted each of these PPP applications, including the application for Bigger Picture.

e.      Investigators searched an email account associated with Recruiter 3 pursuant to a court-issued warrant.  Investigators found an email from Recruiter 2's spouse to Recruiter 3, dated June 23, 2020, with the subject line "Applicant status."  Attached to this email was an Excel spreadsheet, labeled "PPP," which listed "███████ ███████ (███████ middle name) and "The Bigger Picture Logistics" in a tab labeled "Approved," with the amount $300,000.  This tab also listed Borrower 1's name and the amount $836,333.  Investigators also found an email from Recruiter 2's spouse to Recruiter 3, also dated June 23, 2020, with the subject line "Commission

---

[4] Public records indicate that Recruiter 2 and his spouse resided at an address in Palm Beach Garden, Florida in or around the relevant time period.  Public records also indicate that Recruiter 2 and his spouse were co-owners, managers, and/or officers of three business entities that were registered with the State of Florida at this same Palm Beach Garden address.

Report." The body of this email contained a table with columns for "Applicant," "Loan amount," "10% of Loan," "20% Pay," "Agreed Amount," and "Paid out." The applicants listed in the table all were individuals that investigators identified as recipients of loans from applications submitted by Recruiter 2, including Borrower 1. The row for Borrower 1 listed a loan amount of $800,000 and an "Agreed Amount" of $20,000. In another message, Recruiter 3 forwarded an email about PPP loan forgiveness to Recruiter 2's spouse and wrote, "Hey hun did you guys do it yet? I want to take advantage of all the forgiveness[.]" Recruiter 3's email account also contained communications between Recruiter 3 and Recruiter 1, to whom ███████ paid a kickback on Bigger Picture's PPP loan from Kabbage.

f.      Email correspondence between Recruiter 3 and Recruiter 2's spouse also referenced Rhau. For example, on or about June 6, 2020, Recruiter 3 emailed Recruiter 2's spouse purported copies of eight individuals' IRS Forms 1040 (Individual Tax Return), including one for Rhau for tax year 2019. Records received from the IRS indicate that Rhau never filed tax returns for 2019 or 2020. The "PPP" spreadsheet that Recruiter 2's spouse sent to Recruiter 3 also listed Rhau in a tab labeled "Applicants."

g.      Phone records reflect no phone communications between ███████ and Rhau until June 8, 2020. ███████ and Rhau then exchanged numerous calls and text messages between June 8, 2020 and July 7, 2020.

h.      Similarly, phone records indicate that ███████ and Recruiter 1 had not communicated by phone until June 13, 2020, between Kabbage's receipt of the Bigger Picture application and disbursement of PPP funds for Bigger Picture. ███████ and Recruiter 1 then exchanged several phone calls and text messages between June 13, 2020 and July 17, 2020.

i.      By contrast, phone records indicate that Rhau communicated by phone calls or text messages several times each month with both Recruiter 1 and Borrower 1 from the beginning of 2020.

j.      Bank records revealed that the borrowers who received PPP funds through applications submitted by Recruiter 2 subsequently made kickback payments to Recruiter 1, Recruiter 2, Recruiter 3, and others.  These kickback payments varied but in many cases totaled around 20 percent of the loan amount.[5]  In total, I have identified at least $528,122 in kickback payments received by Recruiter 2 and his spouse, $406,772 in kickback payments received by Recruiter 3, and $143,760 in kickback payments received by Recruiter 1, all from borrowers who received PPP funds as a result of applications submitted by Recruiter 2.

31.      Based on the investigation to date, I have determined that Bigger Picture's application to Kabbage vastly overstated Bigger Picture's 2019 employees and payroll expenses:

a.      Records from the Massachusetts Department of Revenue indicate that Bigger Picture had not reported having employees, as required by Massachusetts law, during the period prior to its submission of the PPP application to Kabbage.

b.      Public records indicate that Bigger Picture was not registered with the Massachusetts Secretary of the Commonwealth until April 20, 2020.

---

[5] For example, after one business received a PPP loan of $400,000 in June 2020, the business's owner transferred $40,000 each to Recruiter 1 and Recruiter 2.  After another business received a PPP loan of $713,793 in July 2020, that business's owner issued two $71,379 official bank checks from the business account to Recruiter 2 and Recruiter 3.  Another business received a PPP loan of $800,000 through a PPP application submitted through Recruiter 2, and the business owner subsequently caused three checks, each for $80,000, to be issued to Recruiter 2, Recruiter 3, and a third individual who initially approached the business owner about submitting an application.

c.      Tax return information indicates that Bigger Picture did not file employment tax returns for the tax year 2019.

d.      Bank records for Bigger Picture do not reflect the payroll activity represented on the PPP application.  No bank account for Bigger Picture was opened until June 15, 2020, two days before PPP funds were deposited into the account.

e.      Moreover, after receiving PPP funds, Bigger Picture made a series of payments totaling $115,450 to its three owners between July 2020 and March 2021.  Bigger Picture sent ███████ a total of $40,450 and the other two owners a total of $37,500 each.  Other than the payments to Bigger Picture's owners, Rhau, and Recruiter 1's company, I observed payments with "payroll" in the memo line, totaling $38,000, to two other individuals, one of whom shared the same address as Rhau and operated a business that issued checks to Rhau.

32.      Based on my training an experience, I know that the Form W-3 that was submitted for Bigger Picture was fabricated:

a.      Employers submit quarterly Forms 941 to the IRS that report information about wages paid to employees.  That information corresponds to employment data that employers summarize on Forms W-3.  I have reviewed IRS records with respect to ███████ and Bigger Picture pursuant to an *ex parte* order, and those records do not include any Forms 941 or W-3.

b.      Additionally, the Form W-3 exhibits several infirmities.  Social Security and Medicare taxes should be a fixed percentage of the associated wages (6.2% and 1.45% respectively) and should not be the same amount as the associated wages, as they are listed on the Form W-3 for Bigger Picture that was submitted to Kabbage.  Additionally, because there is no cap on the amount of Medicare wages that are taxable, Medicare wages should be equal to or greater than the gross wages of $1,440,000.  Moreover, the Form W-3 also reported state taxes

11

withheld of $66,942 but no state wages.  I have reviewed supporting documents for other PPP applications submitted by Recruiter 2, and I have observed numerous Forms W-3 with similar discrepancies, including one for Borrower 1's business.

       c.     Further, based on my training and experience, I believe that the Forms 940, 941, and 1120 that were submitted to Kabbage in February 2021 were fabricated in an attempt to support the second draw PPP application for Bigger Picture.  IRS records indicate that Bigger Picture never filed any of these tax forms.

       33.     On or about September 8, 2021, an undercover agent (the "UC") called ▮▮▮▮▮ and posed as an employee from Kabbage's customer relations department.  During this phone call, ▮▮▮▮▮ described Bigger Picture as a trucking company and confirmed that he is one of its owners.  ▮▮▮▮▮ stated that he prepared and submitted the PPP application that Kabbage had approved.  He stated that Bigger Picture's other two owners were aware of the application. ▮▮▮▮▮ told the UC that he had estimated that Bigger Picture's monthly payroll expenses were $20,000 to $30,000 per month.  He also stated that, prior to his submission of the loan application, Bigger Picture had 20 employees, and that Bigger Picture had since downsized to 15 employees. ▮▮▮▮▮ stated that he completed the PPP application himself and that a friend named Richard (whom I believe to be Rhau) assisted ▮▮▮▮▮ with preparing payroll documentation submitted to Kabbage.  ▮▮▮▮▮ stated that he used the PPP funds for payroll, insurance expenses, rent, and other business expenses.  He told the UC that he had applied for a second PPP loan during the program's "second draw" period, but that this application had been rejected.  ▮▮▮▮▮ also asked the UC, whom he believed worked at Kabbage, to update the email address that Kabbage had on

file for him, because the address that Kabbage had on file for him (wensherby@gmail.com)[6] was not his email address. He told the UC that he planned on applying for PPP loan forgiveness.

34.     Kabbage's records indicate that, on or about November 2, 2020, ███████ spoke with a Kabbage employee and requested that Kabbage update the email address it had on file. Kabbage's records reflect that ███████ inquired about PPP loan forgiveness, but that loan forgiveness applications were not accepted at that time.

### Other Applications

35.     Rhau also caused the submission of five PPP applications and three EIDL applications for Dege Services or himself. Based on my review of the loan applications and bank records, I have concluded that each of these applications contained misrepresentations.

36.     Rhau submitted the following applications for Dege Services:

a.      On or about April 21, 2020, Rhau submitted a PPP application to Bank of America requesting a PPP loan of $62,000 for Dege Services. This application stated that Dege Services had five employees and average monthly payroll expenses of $25,000. The application listed Rhau's spouse as the sole owner and the Subject Premises as the business's address. Rhau included his own email address and the number for the Subject Device on the application. In support of the application, Rhau submitted a purported Form 940 indicating that Dege Services had paid employees $301,118 in wages in 2019, as well as a Form 941 showing that Dege Services had paid five employees a total of $77,084 in the first quarter of 2020. Bank of America approved this application and disbursed $62,000 to a Dege Services bank account controlled by Rhau.

---

[6] Based on the investigation to date, I believe that Recruiter 2 created this email address in connection with submitting the PPP application for Bigger Picture and that ███████ never used this email address.

b.       On or about July 2, 2020, Rhau submitted an EIDL application to the SBA for Dege Services.  This application indicated that Dege Services employed four individuals, earned gross revenue of $122,000, and had a total cost of goods sold of $65,000 for the 12 months prior to January 31, 2020.  The SBA approved this application and disbursed $23,500 in EIDL funds to a Dege Services bank account controlled by Rhau.

c.       On or about July 4, 2020, Rhau submitted a second EIDL application for Dege Services.  This application stated that Dege Services had ten employees, gross revenue of $170,718, and cost of goods sold of $28,072 for the 12 months prior to January 31, 2020.  After approving this application, the SBA disbursed a $10,000 grant and a $61,300 loan to a Dege Services bank account controlled by Rhau.

37.      I have reviewed bank records for Dege Services and for Rhau's spouse.  The bank records do not reflect any payments resembling payroll expenses prior to the submission of the April 2020 PPP application, nor do they reflect revenues or expenses of the kind claimed on the EIDL applications.

38.      Rhau also submitted, or caused the submission of, the following applications for himself:

a.       On or about July 8, 2020, Rhau submitted an EIDL application to the SBA.  This application stated that Rhau operated a tractor trailer transportation business located at the Subject Premises.  The application stated that the business employed one individual and had gross revenue of $224,450 and no cost of goods sold for the 12 months prior to January 31, 2020.  The SBA denied this application.

b.       On or about July 12, 2020, Kabbage received a PPP application for Rhau requesting $20,833.  This application stated that Rhau's pay in 2019 was $100,008.  Kabbage denied this

application.  Rhau's name appeared on the "PPP" spreadsheet that Recruiter 2's spouse sent to Recruiter 3, described above, and business records indicate that the application was submitted from the IP address associated with Recruiter 2.  I therefore believe that Recruiter 2 submitted this application to Kabbage.

c.       On or about January 27, 2021, Rhau submitted a PPP application to Itria requesting $20,833.  This application stated that Rhau's pay in 2019 was $130,776.  Itria denied this application.

d.       On or about April 9, 2021, Rhau submitted a PPP application to Fountainhead requesting $20,833.  This application stated that Rhau's net profit from business was $100,000. Fountainhead approved this application and disbursed $20,833 to a bank account controlled by Rhau.

e.       On or about April 26, 2021, Rhau submitted a second draw PPP application to Fountainhead requesting another $20,833.  This application also stated that Rhau's net profit from business was $100,000.  Fountainhead approved this application and disbursed another $20,833 to a bank account controlled by Rhau.

39.      IRS records indicate that Rhau did not file tax returns for 2019 or 2020.  I have reviewed bank records for Rhau, and these records do not reflect income of the kind claimed on these applications.

**Probable Cause to Search the Subject Premises**

40.      There is also probable cause to believe that the Subject Premises will contain fruits, evidence, and instrumentalities of violations of the Target Offenses, as described in Attachment B to the proposed warrant to search the Subject Premises.  Specifically, there is probable cause to

believe that the Subject Device will be located at the Premises, and that it will contain communications and other data evidencing the commission of the Target Offenses.

41.     Based on surveillance of Rhau and the Subject Premises conducted as recently as November 29, 2022, I have determined that Rhau resides at the Subject Premises.  Public records indicate that Rhau previously owned the Subject Premises in his name, and that the Subject Premises have been owned in the name of Rhau's spouse since late 2020.  Additionally, Rhau listed the address for the Subject Premises on loan applications, and the address is listed as the address for Dege Services with the business's USDOT license.  I am not aware of any other location where Rhau might reside.

42.     Based on the investigation to date, I believe that Rhau used the Subject Device to communicate with Recruiter 1, ████ and Borrower 1 about fraudulent PPP applications submitted to Kabbage.  Telephone records indicate that Rhau spoke by phone call and text message from the Subject Device with Recruiter 1, ████ and Borrower 1 throughout June and July 2020, around the time that Recruiter 2 submitted the fraudulent applications, Kabbage disbursed funds, and ████ and Borrower 1 paid kickbacks to Recruiter 1 and Rhau.  For example, on or about June 8, 2020, at approximately 8:57 p.m., ████ called Rhau for the first time.  Rhau placed a phone call to Recruiter 1 immediately after this call from ████ at approximately 9:01 p.m.  Over the next several hours, Rhau and Recruiter 1 exchanged phone calls with each other at least nine additional times.  During this same time period, Recruiter 1 and Recruiter 3 exchanged at least four phone calls.  Toll records also indicate that Recruiter 3 communicated with Recruiter 2 and Recruiter 2's spouse by phone at least five times each during this same time period. According to Kabbage's records, at approximately 12:04 a.m. on June 9, 2020, the PPP application for Bigger Picture was created, and at approximately 12:12 a.m., three PDF files were uploaded in

connection with the PPP application for Bigger Picture: ███████ Massachusetts driver's license, Bigger Picture's Articles of Incorporation, and the purported 2019 Form W-3.  Based on these phone and business records and my knowledge of the investigation to date, I believe that, during this time period, ████████ communicated with Rhau about a PPP application; Rhau then communicated with Recruiter 1; and Recruiter 1 then relayed information to Recruiter 3 for the submission of Bigger Picture's PPP application.

43.    Based on my training and experience, I am aware that mobile phone users typically correspond with other individuals through both phone calls and text messages.  I also am aware that mobile phone users typically keep their mobile phones on their persons or, while at home, elsewhere in their residences.

44.    Business records reflect that Rhau listed the number for the Subject Device on the PPP and EIDL applications that he submitted or caused to be submitted for Dege Services and himself.

### Seizure of Computer Equipment and Data

45.    From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

46.    Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have

capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data. Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

47.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet. This is true because:

a.     Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

b.     Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.     Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from

operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.      Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."  The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.      Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

f.      As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why,

when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.  For example, images stored on a computer may both show a particular location and have geolocation information

incorporated into its file data.  Such file data typically also contains information indicating when the file or image was created.  The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera).  The geographic and timeline information described herein may either inculpate or exculpate the computer user.  Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation.  For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.      A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.      The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.

Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    i.    Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

48. Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.    The volume of evidence – storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on-site.

b.      Technical requirements – analyzing computer hardware, computer software

or storage media for criminal evidence is a highly technical process requiring

expertise and a properly controlled environment.  The vast array of computer

hardware and software available requires even computer experts to specialize in

some systems and applications.  Thus, it is difficult to know, before the search,

which expert possesses sufficient specialized skill to best analyze the system and

its data.  Furthermore, data analysis protocols are exacting procedures, designed to

protect the integrity of the evidence and to recover even "hidden," deleted,

compressed, or encrypted files.  Many commercial computer software programs

also save data in unique formats that are not conducive to standard data searches.

Additionally, computer evidence is extremely vulnerable to tampering or

destruction, both from external sources and destructive code imbedded in the

system as a "booby trap."

Consequently, law enforcement agents may either copy the data at the premises to be searched or

seize the computer equipment for subsequent processing elsewhere.

49.      The premises may contain computer equipment whose use in the crime(s) or storage

of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owner☐s knowledge.  In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant.  If the things described in

Attachment B are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site in order to determine their true

use or contents, regardless of how the contents or ownership appear or are described by people at the scene of the search.

50.     The law enforcement agents will endeavor to search and seize only the computer equipment which, upon reasonable inspection and/or investigation conducted during the execution of the search, reasonably appear to contain the evidence in Attachment B because they are associated with (that is used by or belong to) Rhau.  If however, the law enforcement agents cannot make a determination as to use or ownership regarding any particular device, the law enforcement agents will seize that device pursuant to the probable cause established herein and seek additional authority to search it.

### Unlocking a Device Using Biometric Features

51.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

52.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor. In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours and the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch

ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

53.    The passcode that would unlock the Subject Device is not currently known to law enforcement.  Thus, it may be useful to press Rhau's fingers to the device's fingerprint sensor or to hold the device up to Rhau's face in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

54.    For these reasons, I request that the Court authorize law enforcement to press Rhau's fingers (including thumbs) to the sensor of the Subject Device or place the Subject Device in front of Rhau's face for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

### *CONCLUSION*

55.     Based on the information described above, there is probable cause to believe that that ████ and Rhau have violated 18 U.S.C. §§ 1349 and 1956(h) in connection with their submission of fraudulent loan applications and engagement in financial transactions with fraudulently obtained loan proceeds.

56.     There is also probable cause to believe that evidence, fruits, and instrumentalities of all of the Target Offenses, as described in Attachment B to the proposed warrant to search the Subject Premises, are contained within the premises described in Attachment A.

Sworn to under the pains and penalties of perjury,

_____
Than Nguyen
Special Agent
IRS, Criminal Investigation

Sworn to via telephone in accordance with Federal Rule of
Criminal Procedure 4.1 on January ___ **Jan 24, 2023**

_____
Hon. Judith G. Dein
United States Magistrate Judge

23-5015-JGD
23-5017-JGD

26